In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00008-CV**
_____


**IN THE INTEREST OF J.N.**

_____

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-218,747**
_____

**MEMORANDUM OPINION**

After a bench trial, the trial court entered an order that terminated the parental rights of J.N. (Jane) and J.W. (John) to their child, J.N.[1] *See* Tex. Fam. Code Ann. § 161.001 (West 2014). In this appeal of the judgment terminating their parental rights, Jane and John each raise four issues. In their appellate issues, Jane and John challenge the legal and factual sufficiency of the evidence

---

[1]The minor child and his mother both have the initials "J.N." We will refer to the minor child as "J.N.," and we will use the alias "Jane" to refer to J.N.'s mother and the alias "John" to refer to J.N.'s father. *See also* Tex. R. App. P. 9.8 (We identify a minor child by initials to protect the child's identity.).

1

supporting (a) the statutory grounds on which the trial court terminated their respective parental rights, and (b) the trial court's finding that terminating their respective rights was in the best interest of the child. We affirm the trial court's judgment.

INITIAL REMOVAL AND PETITION FOR CONSERVATORSHIP AND TERMINATION

Jane gave birth to J.N. on January 3, 2013, when Jane was fourteen years old and John was fifteen years old. J.N. weighed seven pounds and thirteen ounces at birth. Jane and John never married. On July 24, 2013, the Department of Family and Protective Services (the Department) filed a petition for a protective order. The Department also filed a petition for conservatorship of J.N. and termination of Jane's and John's parental rights. The petition was supported by an affidavit of a Child Protective Services (CPS) Specialist for the Department that described the circumstances necessitating removal.

According to the affidavit in support of emergency removal, the Department received reports that Jane was not providing her child with adequate nutrition. The affidavit alleged that Dr. Patricia Patterson at Gulf Coast Clinic diagnosed J.N. with "failure to thrive" and J.N. was hospitalized for one week in June 2013 due to his condition. The affidavit in support of emergency removal recited that Dr. Patterson asked Jane how many ounces of formula J.N. was fed. Jane stated five

ounces, but Jane's mother, who was also present during the exam, interrupted and said he was only fed one-and-a-half ounces of formula. Dr. Patterson ordered a home health nurse to monitor J.N. in the home. After one week, the family refused to allow the nurse to continue to monitor J.N. in the home. On July 23, 2013, J.N. was six months old and weighed nine pounds, fifteen ounces, and Dr. Patterson informed the Department that J.N. needed to be removed from Jane's care. That same day J.N. was taken to the "WIC office" by a Home Health Nurse Supervisor, who also transported J.N. and Jane to the Southeast Texas Medical Center because weight and height records demonstrated that J.N. was well below the average weight and height for his age. According to the affidavit, J.N.'s maternal and paternal grandmothers indicated that they thought Jane was not properly feeding J.N.

On August 1, 2013, the trial court entered a Temporary Order Following Adversary Hearing, wherein the trial court included certain findings and a notice to Jane and John as follows:

> The Court finds and hereby notifies the parents that each of the actions required of them below are necessary to obtain the return of the subject child(ren), and failure to fully comply with these orders may result in the restriction or termination of parental rights.

The Department formulated a Family Service Plan for both Jane and John. Thereafter, on September 19, 2013, the trial court issued a Status Hearing Order

3

once again requiring Jane and John to comply with the terms of their service plan and setting a date for the final hearing. A bench trial regarding termination of Jane's and John's parental rights was held in December 2014.

TRIAL TESTIMONY OF CASEWORKER ASSIGNED AFTER J.N.'S REMOVAL

The CPS caseworker for J.N. who was assigned after J.N.'s removal testified that she received the case in August 2013. Regarding J.N.'s weight loss, Jane told the caseworker that Jane fed J.N. an ounce or an ounce and a half of formula, every two hours. She also said that around Easter, J.N. had diarrhea and began to lose weight and Jane took J.N. to the doctor. Jane never indicated to the caseworker that Jane did not know how to feed J.N. The medical staff at Texas Children's Hospital in Houston determined that J.N.'s weight loss was caused by Jane's medical neglect and failing to adequately feed J.N. As a result of J.N.'s malnutrition, J.N. was required to undergo surgery for a "G-tube[.]" According to the caseworker, nursing services were provided to J.N.'s maternal grandmother's home to assist Jane with feeding J.N. but Jane refused the services. The caseworker testified that J.N.'s maternal grandmother stated she had tried to teach Jane how to feed J.N., but that Jane would get upset and stop feeding him. The caseworker explained that J.N.'s paternal grandmother told her that she had also tried to teach J.N.'s parents how to feed J.N.

4

The caseworker testified that J.N.'s physical appearance caused the caseworker concern and that J.N.'s "traumatic weight loss" did not happen until the summer of 2013. In the caseworker's opinion, Jane, by failing to feed J.N. even after she had been trained how to feed J.N., engaged in conduct and placed J.N. with others that engaged in conduct that endangered J.N.'s physical and emotional well-being, and she knowingly allowed J.N. to remain in conditions and surroundings that endangered his physical and emotional well-being.

Jane's court-ordered service plan formulated by the Department stated the goal was "relative fictive kin adoption[,]" and the plan required Jane to contact Good Samaritan Counseling and begin attending "individual counseling to assist with the grief and loss of her son[,]" attend scheduled family visitations, notify the Department of any change in contact information, complete background information forms within ten days, and provide names of relatives for possible placement. According to the caseworker, Jane did not comply with the service plan. The caseworker explained that although Jane had provided names of relatives for possible placement, had completed the required background information forms, and had attended scheduled family visitations with J.N. on a regular basis, Jane had not attended the required counseling and Jane had not "maintained contact" with the Department and the caseworker had to tell Jane to come visit and advised Jane

5

what she needed to do.[2] The caseworker acknowledged that, because Jane was not eligible for a driver's license due to her age, Jane would have to rely on someone else for transportation to counseling, and for some period of time Jane's mother was not available to transport Jane. The caseworker also explained that, since J.N.'s removal, Jane had not been attending school, had not provided any physical items for J.N., had not asked about J.N.'s medical needs or asked about attending J.N.'s medical visits, had not received any training or asked for training regarding taking care of J.N., and had not provided birthday or Christmas presents to J.N. while in the Department's care.

The caseworker testified that Jane was on probation with the juvenile probation department for assault family violence, a felony offense that involved choking her mother, which occurred just prior to J.N.'s removal by the Department. After Jane failed to comply with the deferred adjudication agreement terms, the assault case proceeded to court. The caseworker explained that, at the time of trial, Jane had not been attending school as she should and there was a directive to apprehend her for truancy. According to the caseworker, at the

---

[2]We note that "maintaining contact with the Department" is not stated as a condition within Jane's service plan. However, the service plan required Jane to contact the Department "within 3 days (72 hours) of any changes in contact or locating information[,]" and to "contact caseworker at least 2 hours prior to visitation notifying [the Department] of her inability to attend visitation."

conclusion of the trial, Jane was to be placed in a detention facility. The caseworker was aware that Jane's mother had secured an apartment, and the caseworker agreed that J.N.'s grandmother loves J.N.

The caseworker further testified that at the time of trial J.N. was participating in speech therapy to assist with chewing and verbalization, physical therapy as a preventive measure for his transition to a new placement so he does not regress, and special skills therapy to assist with all developmental areas. J.N. also sees a nutritionist monthly to monitor his weight and eating. According to the caseworker, J.N. has "severe long term issues" and will require continued care in the future. J.N.'s foster mother attended the trial, and she and her family were taking care of J.N.'s needs at the time of trial. The caseworker explained that J.N. was developmentally delayed by "a couple of months" but had made "extreme progress" both with his weight gain and developmental delays since he has been in foster care.

With respect to John, the caseworker testified that John has always claimed he was J.N.'s father and that he reported that he had been helping care for J.N. prior to the Department's removal of J.N. The Department developed a service plan for John, which the court ordered him to comply with at the time of the status hearing, and the caseworker reviewed the service plan with John. At the status

hearing John was present and the trial court warned John that his rights could be terminated if he did not comply with the service plan.

The service plan required John to complete background information forms within ten business days, contact Good Samaritan Counseling and begin attending individual counseling, provide names of relatives for possible placement for J.N., attend scheduled family visitations with J.N., and notify the Department of any changes to his contact information. The caseworker explained she had difficulty contacting John throughout the case and that he had failed to appear for the prior hearing. According to the caseworker, John failed to maintain contact with the Department[3] and failed to complete the background information forms. John provided the names of relatives for J.N.'s possible placement, but all of the possible placements suggested by John and Jane were either unqualified or unwilling to fulfill the obligation. Although at the time of trial J.N. had been in foster care for almost seventeen months, according to the caseworker, John only attended about ten visits. The caseworker testified that initially John was attending the family visitations, but then his attendance became very sporadic and it was not

---

[3]We note that "maintaining contact with the Department" is not a requirement of John's service plan. However, the service plan required John to contact the Department "within 3 days (72 hours) of any changes in contact or locating information[,]" to "contact caseworker at least 2 hours prior to visitation notifying [the Department] of [his] inability to attend visitation."

unusual for him to miss several visits in a row. At the last visitation John attended, John did not stay the entire visit and left after ten to fifteen minutes. John also failed to attend free counseling. The caseworker explained that John may have attempted to contact her "once or twice throughout this case" but that the caseworker otherwise had to initiate contact with John.

According to the caseworker, at the visits John had trouble getting J.N. to eat. John brought clothes for J.N. to one visit. In the caseworker's opinion, John has not had significant contact with J.N. during the pendency of the case and a "significant relationship" between them does not exist. The caseworker explained that: John did not have independent housing appropriate for J.N.; John had not received training regarding J.N.'s medical needs and had not asked to go to any of J.N.'s doctor's appointments; John had not provided any items besides the clothing he brought to one visit, he had not tried to find out what he could contribute to J.N.'s medical bills; and, John had not attempted to send J.N. Christmas or birthday presents. The caseworker also testified that John would not know how to care for J.N. for twenty-four hours if J.N. were returned to him and that she believed it is in J.N.'s best interest for John's parental rights to J.N. be terminated.

According to the caseworker, the Department's plan for J.N. is unrelated adoption. The caseworker stated that the Department would complete an adoption

9

broadcast and that some families have already inquired about adopting J.N. At the time of the trial, J.N. had made a connection with some families who are interested in him, and the caseworker believes that it is very likely that J.N. will be adopted.

TESTIMONY OF DR. DONARUMA

Dr. Donaruma (Donaruma) is board certified in pediatrics and child abuse pediatrics, and she is a child abuse pediatrician at the Child Protection Clinic at Texas Children's Hospital. Donaruma testified at trial about her treatment of J.N. and offered opinions pertaining to J.N. Donaruma began treating J.N. after his diagnosis of "neglect" and "failure to thrive," and Donaruma was J.N.'s treating physician at the time of trial. J.N. was diagnosed with severe malnutrition, developmental delay, alpha thalassemia,[4] and high risk social situation. Donaruma's last examination of J.N. was a "couple of weeks" before trial. Donaruma admitted that the only medical records showing J.N.'s medical history that she "could get" were from Southeast Texas Medical Center, and that if other records showed that Jane had consistently sought medical treatment for J.N. and private nursing care had been provided to Jane, that it might affect Donaruma's opinion in the case.

---

[4]Donaruma testified that alpha thalassemia "is a change in the hemoglobin from normal[.]"

10

Donaruma described "failure to thrive" as "a term that means a child has failed to stay within his growth trajectory" and "has failed to grow as expected[.]" She explained that before making such a diagnosis, medical professionals use imaging, studies, and bloodwork to rule out "an exceptionally long list" of other possible causes such as an infection, tumor, a problem with absorbing food, and heart failure. Over the almost year-and-a-half that Donaruma treated J.N., she found no other organic problem that would explain J.N.'s malnutrition and failure to gain weight. According to Donaruma, prior to coming into foster care, J.N. needed extra encouragement to eat, and his caregivers did not provide the necessary extra encouragement. Donaruma described the degree of neglect for J.N. as "severe[,]" and Donaruma testified that J.N. "came in at six months old the weight of a two-week-old baby. It was striking." Donaruma indicated that it is not unusual for a child when first hospitalized to drop a little weight and then increase weight as their hospital stay continued, and that it is not surprising that also occurred with J.N. Donaruma agreed that the problems with feeding J.N. that she observed during the time she treated J.N. were consistent with the child having been denied an appropriate amount of food for a substantial length of time. According to Donaruma, J.N.'s hospitalizations were for issues secondary to his

11

malnutrition. Donaruma testified that she attempted to contact Jane and John, and she never received a response from either parent.

Donaruma conducted a swallow study to check for J.N.'s ability to swallow food and he was determined to have "a little bit of reflux[,]" but treating the reflux with medication "did not make much difference." Donaruma stated that because J.N. could not take in the desired amount of calories he needed for a period of time, his G-tube was put in because he needed to "catch up." Once J.N. "caught up[,]" the G-tube was removed. Since the removal of the G-tube, the open hole from the G-tube was leaking, which was "causing some skin irritation and possibly a fungal infection[,]" and if the problem did not resolve over time it might need surgical closure.

Donaruma opined that J.N.'s foster mother and her husband have provided "exceptional" care and that Donaruma is optimistic that J.N. will grow and be healthy. Donaruma noted that based on J.N.'s growth chart, J.N. has gained weight and improved while in foster care. Donaruma also stated, however, that she is "a little guarded because of the degree of neglect" and "that there's a possibility of some emotional problems, some learning problems, and possibly some behavioral problems around food and eating as he gets older." Donaruma stated that she suspects that J.N.'s problems have the potential to be life-long and he will need

special attention for years. Donaruma testified that J.N. is short and that he may have behavioral and emotional problems as a result of his "maltreatment[.]" She explained that J.N. showed mild developmental delays.

In Donaruma's expert opinion, J.N. would be in danger if the trial court returned J.N. to his parents. Donaruma explained that she believes J.N. was the victim of neglect that damaged his physical and emotional well-being, and that J.N. needs a highly attentive parent to avoid regressing.

TESTIMONY OF JANE

Jane testified that she first saw problems with J.N. when he had diarrhea and vomiting and, on April 1, 2013, and April 2, 2013, she took J.N. to Gulf Coast Clinic. According to Jane, up until that point, J.N. had been gaining and not losing weight. A nurse told Jane to take J.N. to the emergency room for the diarrhea. Jane took J.N. to the emergency room, and she was advised to not feed J.N. milk for that day but instead to feed him cereal and water. She followed those instructions and returned to the doctor on April 5, 2013, because J.N. still had diarrhea and he was not eating properly. The doctor told Jane to give him cereal and water and Pedialyte instead of milk that day, and the doctor provided Jane with a can of milk for J.N. Jane followed those instructions and then began giving J.N. the "new milk" provided by the doctor.

13

Jane testified that sometime between April 5th and May 31st, she took J.N. to St. Mary's Hospital emergency room because J.N. did not want to eat. The hospital did an examination, diagnosed J.N. with diarrhea, and discharged J.N. with instructions for Jane to continue feeding him with the different milk. J.N. continued to drink about only one ounce and would not swallow anymore. Jane testified she became "more worried."

According to Jane, she returned to Gulf Coast Clinic on May 31, 2013, for a follow-up appointment, and she told the doctor she was concerned that J.N. was not eating and it was apparent to Jane that the child was not developing appropriately. The doctor changed the milk back to a previous kind, gave Jane some medicine and a breathing machine for J.N.'s chest congestion, and told her to come back in ten days. Jane continued to feed J.N. the milk the doctor suggested, but she testified he would not eat during the day, and it would take him the whole evening to finish a five-ounce bottle. Jane testified she was trying to feed J.N. every hour, but he would not swallow the milk and he spit it out.

Jane testified that she took J.N. back to Gulf Coast Clinic on June 7, 2013, with the same concerns and she requested a different doctor. J.N. was then admitted to the Medical Center of Southeast Texas on June 7, 2013, and he was discharged on June 14, 2013. Jane testified she stayed up at the hospital with J.N.

throughout that week. According to Jane, the hospital staff initially had difficulty getting J.N. to eat. After J.N. was discharged, Jane took J.N. for a follow-up visit at the Gulf Coast Clinic and J.N. had lost more weight. Jane testified that at this appointment she made a "request[] for nurses." At the next appointment on July 5, 2013, J.N. had lost more weight, and the doctor at the Gulf Coast Clinic had a doctor from Houston look at J.N. After Jane left the July 5th appointment, the doctor at the Gulf Coast Clinic later that same day advised Jane to bring J.N. to the emergency room because J.N. was dehydrated. Jane took J.N. to the emergency room, J.N. was admitted to The Medical Center of Southeast Texas, and then he was transferred to Texas Children's Hospital. Jane testified that CPS workers asked her to leave prior to J.N.'s transfer, and she did not visit J.N. at Texas Children's Hospital because CPS would not allow her to go.

Jane testified that private nursing assistance was not made available to her until the week prior to J.N.'s removal by the Department, and that she never declined private care nursing assistance for J.N. Jane explained at trial that she was J.N.'s primary caregiver and that from April to July 2013, she and J.N. were living in a house with her mother, her aunt, and her grandmother. Jane was living with her mother and siblings at the time of trial. Jane testified that she knew how to care for J.N. and that she was currently in school. She stated that when she had

15

possession of J.N., she was also in school. While she was at school Jane's mother cared for J.N. Although Jane did not have a job at the time of trial, she testified that she had an upcoming job interview.

Jane admitted she attacked her mother on June 17, 2013, when J.N. was staying with John. Jane also testified that after court she would be going to a detention facility for truancy. According to Jane, she did everything the Department required of her except she admitted she did not attend any counseling. Jane testified that she never received a call from Dr. Donaruma. Jane testified that, in her opinion, if she had more help from the doctors or nurses "it would have been better[.]" She did not believe she neglected J.N. because she "did everything that [she] could do . . . followed everything the doctor[s] told [her] to do."

### TESTIMONY OF JOHN

John testified that he is J.N.'s father. John had been expelled from school in 2009, 2010, and 2012, and a judge sent John to the Jefferson County Youth Academy. John testified that at the time of trial he was living with his mother, but he did not know her address.

John testified that when he was not working he would go and help Jane with J.N. According to John, Jane tried consistently to feed J.N., and both John and Jane had difficulty getting J.N. to eat. John explained that J.N. spent the night with him

16

on two occasions between April and July 2013, but John could not remember the dates of the overnight visits. During that time period, John said he noticed J.N. getting thinner. As to John's understanding of the reason for J.N. being thin, John explained that John was small when John was young, but as far as J.N.'s weight, "I seen it was a problem. I asked - - that's why I went to the doctor with her and stuff." When asked if John was ever present when the doctors made the changes in the formula and milk, John explained, "I don't like hospitals. I don't like going to the doctors. You pull out needles, I'm going to take off running." John saw J.N. one week prior to when J.N. was admitted to the hospital. According to John, he was never told that he could visit J.N. at Texas Children's Hospital in Houston.

At trial, when the Department showed John photographs depicting J.N.'s appearance at the time of removal, John stated that J.N. looked hungry in the photographs, and John agreed that the average parent or caregiver would have concern with the child's appearance. John acknowledged at trial that in the photographs of J.N. taken two months before trial that J.N. looked healthy and well-nourished. When asked at trial if John would have "gone back" and changed any of his conduct in the three weeks prior to the Department's removal of J.N., John stated that he would have tried "to be there more" and "be a parent" and "have [his] own house, [his] own car[.]"

17

John explained that in the two years prior to trial he worked at Sonic. John testified that he went to Arkansas to get a job and because he did not want to go to school in Port Arthur. He explained that he went to Arkansas for two months, came back, and then left again, and that he was in Arkansas for "[p]robably, like, eight . . . [m]aybe seven" months of the sixteen months that J.N. was in the care of CPS. According to John, during the sixteen-month timeframe that J.N. was with CPS, John provided no financial support for J.N., but John did provide clothes for the child on one occasion. John explained at trial that he did not give the Department financial support for J.N.'s care because "I'm not going to give them my money and I'm not going to give them nothing because they came and took my child." John testified that while J.N. was with CPS, John visited J.N. when John was in Texas and that he had seen J.N. "more than ten times." John stated he did not visit J.N. more because John was in Arkansas.

According to John, the Department had not tried to work with him in regards to getting J.N. back. John explained he left "multiple messages" with the Department. John testified that he provided the Department with names of relatives that had offered to take J.N. John stated that his plan is to go to Job Corps the following month and get his GED, but that he would have to move to be placed in a program, and he could not take J.N. with him during his completion of the

program. John admitted that as part of his service plan he was ordered to attend counseling. He testified he did not go to counseling "because when I was younger, me and my mom had took it and I felt like it was no need to[.]"

## CASA REPORT

A court-appointed special advocate (CASA) prepared a report that was admitted into evidence at trial. The CASA report stated that J.N. had not formed a bond with Jane or John and that no family member seemed able or willing to provide a permanent home for J.N. According to the report, J.N. was progressing well with the foster parent and that the respite family had expressed interest in providing a permanent home for J.N. The CASA agreed with the Department's goal of unrelated adoption. The CASA recommended that the Department be named J.N.'s permanent conservator, that Jane's and John's parental rights be terminated, that J.N.'s placement be approved and continued, and that the respite family be considered as a permanent placement for J.N.

## TERMINATION ORDER

After the bench trial, the trial court signed a final order of termination on December 8, 2014, terminating Jane's and John's parental rights to J.N. and naming the Department as permanent managing conservator of the child. In addition to finding that the termination was in the child's best interest, the trial

court found that Jane and John (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and (3) failed to comply with the provisions of a previous court order. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2). The trial court also found that John had constructively abandoned J.N. *See id.* § 161.001(1)(N). The trial court filed its Findings of Facts and Conclusions of Law, which stated the statutory grounds for terminating Jane's and John's parental rights as to J.N., and that termination was in the best interest of J.N.

### STANDARD OF REVIEW IN PARENT-CHILD TERMINATION CASES

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish at least one ground listed under subdivision (1) of the statute, and must also prove that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Due process requires the petitioner to justify termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014); *In the Interest of J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" is the "measure or

20

degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

In a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (footnote omitted).

STATUTORY GROUNDS FOR TERMINATION

A.    Termination of Jane's Rights Pursuant to Section 161.001(1)(D) and (E)

In part, the trial court's order terminating Jane's parental rights to J.N. is based on subsections 161.001(1)(D) and (E), which provide that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child [or]
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

In Jane's first and second issues, she challenges the sufficiency of the evidence supporting termination under section 161.001(1)(D) and (E). *See id.* Endangerment means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In the Interest of P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.). Subsection (D) requires the endangerment to the child to be the direct result of the child's

environment. *In the Interest of R.D.*, 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Because the evidence pertaining to subsections (D) and (E) is interrelated, we conduct a consolidated review. *In the Interest of T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

The affidavit in support of removal stated that the Department had received concerns that Jane was not providing J.N. with adequate nutrition, and that although Jane told the doctor at Gulf Coast Clinic that Jane fed J.N. five ounces of formula, Jane's mother interrupted and told the doctor that Jane only fed J.N. one-and-a-half ounces of formula. The affidavit also stated that when J.N. was six months old he weighed under ten pounds and that J.N.'s maternal and paternal grandmothers believed Jane was not properly feeding J.N. The trial court heard testimony from the caseworker that J.N.'s "traumatic weight loss" did not happen until the summer of 2013; that the medical staff at Texas Children's Hospital ruled out medical causes for J.N.'s weight loss; that J.N.'s maternal grandmother attempted to teach Jane how to properly feed J.N., but Jane would get upset and stop feeding him; and that Jane refused nursing services to assist her with feeding

23

J.N., and that Jane's failure to properly feed J.N. endangered J.N.'s physical and emotional well-being.

The trial court also heard Dr. Donaruma's expert testimony that at the time of admittance to Texas Children's Hospital, six-month-old J.N. weighed only as much as a two-week-old baby and appeared severely neglected. The trial court heard Donaruma explain that, in the year-and-a-half time period she had been treating J.N., she did not find an "organic" problem that would explain J.N.'s malnutrition, and J.N. was gaining weight and improving while in foster care. Donaruma also testified that J.N. was the victim of neglect that damaged his physical and emotional well-being and that J.N. would be in danger if he was returned to his parents. Although Jane testified that she consistently tried to feed J.N. and that she sought medical care for J.N., the trial court could have found the witnesses that stated Jane was not properly feeding J.N. to be more credible. The trial court also heard evidence from the CASA that Jane had not bonded with the child. And the evidence and testimony established that Jane had attacked her own mother, and that she was to be placed in a detention facility for truancy.

On this record, the trial court could have determined that Jane's conduct demonstrated evidence of endangerment under section 161.001(1)(E). The trial court also could reasonably have formed a firm belief or conviction that Jane

24

engaged in conduct and knowingly placed or knowingly allowed J.N. to remain in conditions that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We conclude that the evidence is legally and factually sufficient to support the trial court's decision to terminate Jane's parental rights under section 161.001(1)(D) and (E). *See J.F.C.*, 96 S.W.3d at 265-66. We overrule Jane's first and second issues. Accordingly we need not consider Jane's arguments as to the trial court's finding under section 161.001(1)(O). *See In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

B.    Termination of Father's Rights Pursuant to Section 161.001(1)(D) and (E)

As part of John's third and fourth issues, he challenges the sufficiency of the evidence supporting termination under section 161.001(1)(D) and (E).[5]

The trial court heard John's testimony that John noticed J.N. getting thinner from April 2013 to July 2013. The trial court heard John explain that John was not present with Jane when the doctor made changes in J.N.'s formula and milk, because he does not "like hospitals. . . . [o]r like going to the doctors." At trial,

---

[5]In John's first and second issues, he challenges the sufficiency of the evidence establishing his neglect of J.N. Although the trial court made no specific finding of neglect, we regard evidence of neglect as part of the trial court's finding of endangerment under section 161.001(1)(D) and (E) as to John. *See In the Interest of M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (Endangerment can occur through both acts and omissions of a parent, and parental neglect can be as dangerous to a child's well-being as direct abuse.).

when John was shown pictures of J.N. at the time of removal, the trial court heard John admit that the average parent or caregiver would have concern with the child's appearance. John acknowledged that he and Jane had difficulty getting J.N. to eat. The trial court also heard Dr. Donaruma's expert testimony that at the time of admittance to Texas Children's Hospital, six-month-old J.N. weighed only as much as a two-week-old baby and appeared severely neglected. Donaruma explained that, in the year and a half she had been treating J.N., she did not find an "organic" problem that would explain J.N.'s malnutrition, and J.N. was gaining weight and improving while in foster care. According to Donaruma, J.N. was the victim of neglect that damaged his physical and emotional well-being and J.N. would be in danger if he was returned to his parents. Although John testified that he had kept J.N. on two nights, John's own testimony established that he left J.N. with Jane and that he had moved out of state for several months.

Considering this evidence, the trial court could reasonably have formed a firm belief or conviction that John engaged in conduct and knowingly placed or knowingly allowed J.N. to remain in conditions that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We conclude that the evidence is legally and factually sufficient to support the trial court's decision to terminate John's parental rights under section 161.001(1)(D)

26

and (E). *See J.F.C.*, 96 S.W.3d at 265-66. Accordingly we need not consider John's other arguments challenging the trial court's findings under sections 161.001(1)(N), and (O). *See A.V.*, 113 S.W.3d at 362.

BEST INTEREST OF THE CHILD

Jane's fourth issue and John's third and fourth issues challenge the sufficiency of the evidence supporting the finding that termination of their respective parental rights is in J.N.'s best interest. The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry of whether termination of parental rights is in the best interest of the child including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (West 2014). No particular *Holley* factor is controlling, and evidence of one factor

27

may be sufficient to support a finding that termination is in the child's best interest. *In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In the Interest of N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

As to whether termination of Jane's parental rights is in the child's best interest, the trial judge could have considered that Dr. Donaruma testified that at the time J.N. was removed he was suffering from failure to thrive and severe malnutrition due to not being adequately fed, that at six months of age J.N.'s weight was only that of a two-week old baby, and that J.N. would be in danger if returned to Jane's care. The trial court heard testimony that J.N. gained weight under the care of medical personnel and also with his foster parent, but lost weight when under his parents' care. At the time of trial Jane was on probation for assault family violence against her mother, and she had violated her probation by failing to attend school. *See In the Interest of R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (evidence of a parent's past convictions may support the trial court's best interest finding). In weighing Jane's stability and ability to provide adequate care for J.N., the trial court could have also considered Jane's age, the fact that she would be going into a detention center after the trial because she

violated her probation, and her failure to recognize the need for counseling. *See In the Interest of C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). The trial court also heard evidence that Jane did not comply with the provisions of her service plan. *See In the Interest of M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (a parent's noncompliance with a service plan may be considered by the fact-finder when determining the child's best interest). The trial court could have also considered the CASA's report regarding lack of an emotional bond between J.N. and Jane. *See In the Interest of C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.). The trial court heard the CPS caseworker's testimony that J.N. was making progress while placed with the foster parents and Dr. Donaruma's testimony that the foster mother was providing J.N. with "exceptional" care. The trial court could have considered the CASA's recommendation of non-relative adoption, and the CPS caseworker's testimony that Jane would not be able to meet J.N.'s need if he was returned to Jane.

As to whether termination of John's parental rights is in the child's best interest, the trial court could have considered that John failed to regularly visit J.N. and had not seen J.N. in the last four months prior to trial. The trial court heard testimony that John had difficulty getting J.N. to eat during scheduled family visits, dropped out of school, left the state for several months, failed to attend counseling

29

in accordance with his service plan, and failed to financially support J.N. during the case even though he testified he had been gainfully employed. John also testified that he planned on going into a Job Corps program and that he would not be able to care for J.N. while in the program. The court heard John's testimony that J.N. appeared hungry in the photographs taken at the time of removal and that the average parent would have been concerned with the child's appearance. The trial court could have also considered the CASA's recommendation of unrelated adoption and the caseworker's testimony that J.N. was thriving in the foster home and would likely be adopted.

Accordingly, we conclude that the Department established by clear and convincing evidence that termination of Jane's and John's parental rights is in the child's best interest. We overrule Jane's fourth issue and John's third and fourth issues. The trial court's judgment is affirmed.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 1, 2015
Opinion Delivered May 21, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.

30